**UNITED STATES of America, Appellee,**

v.

**Rayful EDMOND, III, Appellant.**

Nos. 90–3211, 90–3212, 90–3213, 90–3214, 90–3215, 90–3216, 90–3217, 90–3218, 90–3219, 90–3220, 90–3241, 91–3146, 91–3147, 93–3114, 93–3115, 93–3116, 93–3117, 93–3118, 93–3119, 93–3120, and 93–3121.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1995.

Decided April 28, 1995.

Orders Denying Rehearing and Suggestion for Rehearing In Banc July 19, 1995.

Elise Haldane, appointed by this Court, argued the cause and filed the briefs, for appellant James Antonio Jones.

Neil Jaffee, Asst. Federal Public Defender, argued the cause, for appellant Keith E. Cooper. With him on the briefs was A.J. Kramer, Federal Public Defender.

Jensen E. Barber, appointed by this Court, argued the cause and filed the briefs, for appellant Emanuel W. Sutton.

Leroy Nesbitt, appointed by this Court, argued the cause and filed the briefs, for appellant Tony Lewis.

Daniel E. Ellenbogen, appointed by this Court, argued the cause and filed the briefs, for appellant Rayful Edmond, III.

Joseph R. Conte, appointed by this Court, argued the cause and filed the briefs, for appellant Jerry R. Millington.

Robert E. Sanders, appointed by this Court, argued the cause and filed the briefs, for appellant Armaretta B. Perry.

David B. Smith, appointed by this Court, filed the briefs, for appellant David W. McCraw.

G. Godwin Oyewole, appointed by this Court, filed the briefs, for appellant Bernice H. McCraw.

Steven R. Kiersh, appointed by this Court, filed the briefs, for appellant Melvin D. Butler.

Leonard L. Long, appointed by this Court, filed the briefs, for appellant John Monford.

Elizabeth H. Danello, Asst. U.S. Atty., argued the cause, for appellee. With her on the brief were Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Asst. U.S. Atty.

Before: EDWARDS, Chief Judge; and SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

Eleven defendants appeal judgments of conviction on charges relating to the operation of a large-scale cocaine distribution conspiracy allegedly run by appellant Rayful Edmond, III from 1985 until Edmond's arrest in April 1989. A 43–count superseding indictment filed on June 20, 1989, charged appellants, along with 18 others, with a variety of drug-related charges, including conspiracy to distribute and to possess with intent to distribute more than five kilograms

of cocaine and more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a) and 846 (1988). In addition, the indictment charged Edmond with leading a continuing criminal enterprise ("CCE") involving at least 150 kilograms of cocaine and at least 1.5 kilograms of cocaine base, in violation of 21 U.S.C. §§ 848(b) and 853. The indictment also charged appellants Edmond, James Antonio Jones, and Jerry Millington with offenses involving firearms and violence, including homicide. Finally, the indictment sought forfeiture of certain assets owned by the co-conspirators, including four residences, a Chevrolet Corvette, a Jaguar XJS convertible, and a Mercedes–Benz 190E, pursuant to 21 U.S.C. § 853(a)(1) and (a)(2).

On August 9, 1989, the District Court severed the counts of the indictment alleging crimes of violence and firearms offenses from the conspiracy and drug-related charges. As to the latter charges, the court split the defendants into two groups for trial. This appeal arises from the first drug conspiracy trial.

## I. BACKGROUND

### A. The Government's Evidence

At trial, the Government presented evidence that Edmond led a group of family members and friends who conspired to distribute large amounts of cocaine in the northeast Washington neighborhood where many of them lived and where Edmond grew up. Those involved in the conspiracy were Edmond; his friends, Melvin Butler and Tony Lewis; Edmond's half-brother, Emanuel Sutton ("Mangie"); his half-sister, Bernice Hillman McCraw ("Niecy"), and her husband, David McCraw; Edmond's cousin John Monford ("Johnny"); Edmond's aunt Armaretta Perry; and Edmond's sister's boyfriend, Jerry Millington; along with James Antonio Jones ("Tonio"), Keith Cooper ("Cheese"), and others not involved in this appeal.

According to the Government's evidence, the conspiracy involved a multi-layered operation. Its focus was a two-block area of Morton Place and Orleans Place, N.E., known as "the Strip," which served as an open-air market for cocaine powder and cocaine base, supplied by the Edmond organization from early 1986 through at least 1988. In operating the drug business, sellers, paid by the day or week, worked in eight-hour shifts. Demand for drugs along the Strip was so intense during this period that sellers sometimes sold out their supplies within minutes. Individuals dubbed "lieutenants" of the organization, including Cooper and Sutton, supplied sellers, including at least one juvenile, with bundles of cocaine, collected money from them, and shouted warnings when police entered the area. These lieutenants, along with Millington, Jones, and Monford, supervised the Strip, controlling the supply of cocaine and overseeing sellers.

The Government presented evidence that the lieutenants stored drug supplies in abandoned houses at 653 Orleans Place, 656 Orleans Place, and 642 Morton Place in northeast Washington, D.C. Police who executed search warrants at those addresses in early 1988 discovered a total of 300 grams of cocaine and 400 grams of cocaine base, thousands of dollars in cash, and nine firearms. After one search, police saw Jones and Millington watching four other persons clean up an apartment in the 656 Orleans Place house. During a February 18, 1988, search, police observed Cooper, who had been supplying sellers in the 600 block of Orleans Place when police arrived, throw down $1,400 in cash. Police recovered 100 $25 bags of cocaine in a plumbing pipe in the basement of the house as a result of that search.

To supply the Strip, several associates of Edmond, including David and Bernice Hillman McCraw and Armaretta Perry, packaged cocaine at various sites, including the McCraw apartment. Once packaged, the cocaine was stored at various homes, including the apartment of Millington and his girlfriend, Edmond's sister Rachelle Edmond, in Suitland, Maryland; and the apartment of David McCraw's friend James Minor, who McCraw had recruited into the organization. The organization also stored drugs at the Edmond family home at 407 M Street, N.E., Edmond's residence until he graduated from high school and a hub for the conspiracy. Edmond's aunt, Armaretta Perry, resided in and controlled the house which contained

more than 200 grams of cocaine when police searched it on February 5, 1988.

Kathy Sellers, a school friend of Edmond and former girlfriend of Jones, who had been heavily involved in the Edmond organization, cooperated with the Government's investigation. She testified that drugs were hand carried from storage houses to the Strip. At the direction of Millington, Sellers began picking up bags of cocaine in the fall of 1987, sometimes at Millington's home. Later, she received drugs from David McCraw. After receiving the drugs, she drove to the Strip and delivered the supply to Millington, Cooper, Monford, Jones, and others. She made such deliveries until the early summer of 1988, receiving $800 per week from Millington as compensation. David McCraw also delivered drugs after receiving them at James Minor's apartment building. Minor himself later accompanied McCraw in bringing cocaine to Sellers's apartment and, after Sellers stopped making deliveries, directly to the Strip. In making such deliveries, the two parked a few blocks from the Strip, then found a "lieutenant," such as Jones or Cooper, who would send a runner to the car to pick up the contraband.

The Government presented evidence that the Edmond organization also acted as a drug wholesaler. On December 11 and 15, 1987, an undercover officer purchased half-ounces of cocaine near 407 M Street from a juvenile, Harry "Whitey" Sullivan, whom Emanuel Sutton identified as an associate of Edmond. On October 28, 1988, Sutton himself promised to sell the officer a kilogram of cocaine for $22,000. On December 14, 1988, David McCraw sold an ounce of cocaine to the same officer. Stevenson McArthur, a drug dealer, testified that he bought three half-kilograms of cocaine from Edmond for $10,000 each in 1987 and 1988.

Regarding the proceeds from drug sales, the Government's evidence indicated that Kathy Sellers picked up money from sales on the Strip, collecting amounts ranging from $400 to $10,000 from Cooper, Monford, and others, and delivering the cash to Millington or holding it at her own apartment. At Millington's house in Upper Marlboro, Maryland, Sellers saw Edmond's mother, Constance Perry, count thousands of dollars with a money-counting machine. In April 1989, police found two money-counting machines, along with Cooper's personal papers, in a residence at 25 19th Street, S.E. When police searched the Edmond home in February 1988, they found more than $27,000 in cash. Further, Edmond's childhood friend, Royal Brooks, twice picked up money from Millington's house at Edmond's request, and once stored between $2 million and $3 million for Edmond.

According to the Government, the Edmond organization received the cocaine that fueled its activities from Colombia through a series of transactions with Melvin Butler in California. The Government presented evidence that Edmond associates Royal Brooks, Alta Rae Zanville, Tony Lewis, and Edmond himself, made trips from Washington to Los Angeles in 1988 to arrange for, and pay for, shipments of cocaine to Washington. On a trip taken January 11, 1988, Edmond, Brooks, and others flew from Washington to Los Angeles, where they met Butler. Edmond and Butler obtained approximately 200 kilograms of "cooked" cocaine, then packaged it in kilogram lots. They then delivered the drugs to a mobile home that Edmond said was bound for Washington. On April 7, 1988, Edmond sent Zanville to Los Angeles with $1.5 million in cash. Once in California, she left the money with Butler. On May 4, 1988, Edmond sent Zanville and Brooks separately to California with a total of $1.5 million in cash. Zanville became impatient waiting for Edmond's call at her Los Angeles hotel, and left her share of the money with Brooks. The next day, Brooks, Butler, and two Californians were arrested in Los Angeles while attempting to buy 224 kilograms of cocaine from an undercover officer in exchange for the money that Brooks had brought.

Various persons were involved in the shipment of cocaine from Los Angeles to Washington. Beginning in the early spring of 1988, James Mathis helped to deliver cocaine from Butler from Los Angeles to Washington. Mathis flew to Washington about eight times with suitcases full of kilogram-sized bricks of cocaine. Once in Washington,

Mathis would page Edmond, and a courier would be sent to pick up the drugs. In addition, Royal Brooks testified that he regularly collected cocaine from Butler and others at various hotels and residences in the Washington area, beginning in the summer of 1987.

The Government also offered evidence of the unexplained wealth of the defendants and recorded statements obtained from wiretaps placed by investigators with court authorization on two telephone lines located inside 407 M Street. As an example of unexplained wealth, Edmond owned a number of expensive cars, including a Jaguar convertible with gold-plated hubcaps, spent $21,000 to furnish his house in Maryland, paid $29,000 in cash for various items of jewelry and for jewelry repair, and once, along with Lewis, spent between $20,000 and $25,000 on clothes purchased at a single store. However, according to a close friend, Edmond had held no job since high school. Others in the organization similarly were inexplicably wealthy. For example, Lewis owned a Range Rover, a BMW, a Mercedes, and several Porsches.

The Government's two wiretaps, one of 30 and one of 60 days' duration, recorded an August 17, 1988, call to Butler in which Edmond promised to send "three or four million," and Butler referred to Edmond as "my partner." Joint Appendix ("J.A.") V 69–70. On August 24, 1988, an unidentified man telephoned Edmond to report that "Whitey got the dude around here now," and to ask whether he should "give it to him." J.A. V 21. Edmond told the caller to give the man "the half." *Id.* Additionally, after agreeing to cooperate with the Government, Zanville consented to the recording of her conversations with other members of the conspiracy. In one of these, Edmond's mother, Constance Perry, described how Edmond's operations started with "his daddy," and described her son's early days of drug dealing with Monford:

> [W]hen he started out, it was just like, you know, like he was doing hand to hand coming, him and Johnny ... on the corner and they was selling and they was getting it from Ray [Edmond's father].... And

then he ... it just got too big, he just up and went out on his own.

J.A. VI 47.

## B. The Defense Evidence

In defense, Edmond sought to impeach the credibility of Zanville, the Government's chief witness. He called Zanville's former husband, Myron Zanville, and his sister, who testified that Zanville had a bad character for truthfulness and a weak head for figures. In addition, a former friend of Zanville contradicted Zanville's testimony on cross-examination regarding her possession of several fur coats, and asserted that she did not trust Zanville. In an effort to explain his wealth, Edmond also presented evidence of his obsession with and extraordinary luck at gambling. For example, his friend Clarence Green stated that Edmond won $20,000–$40,000 each time he gambled.

On behalf of Jerry Millington, Georgetown University basketball star Alonzo Mourning testified that, although he visited Millington's house in Upper Marlboro a number of times in the fall of 1988, he never saw drugs, large amounts of money, money-counting machines, or anything else unusual. Millington's sister said she lived at her brother's house for five months in 1988 and had no knowledge of drug activity during that time.

Like Edmond, Emanuel Sutton sought to paint Zanville in a negative light. He called one of Zanville's colleagues from her job at the Department of the Navy, who described Zanville's modest salary, flashy clothing and cars, and, in response to Zanville's testimony about her drug activities during the working day, the limited leave she was allowed. In addition, a defense investigator described the dilapidated condition of Sutton's house.

James Antonio Jones presented a defense of misidentification. His sister and brother both testified that Jones resembled another man, Leslie "June" Wheeler. In defense against Count 4 of the redacted indictment, which charged him with possessing a kilogram of cocaine recovered from the trunk of a Toyota on February 6, 1986, Jones presented evidence that the car trunk also contained numerous documents belonging to other per-

sons, as well as a motorcycle helmet. Jones did not ride a motorcycle.

Bernice Hillman McCraw called David McCraw's mother, who lived with the couple and claimed that she had paid for their wedding and honeymoon and that all household expenses were split three ways, and denied ever seeing any drugs or drug paraphernalia in the apartment.

Keith Cooper's grandmother testified in his defense that he had moved out of 25 19th Street, S.E., in 1986 or 1987, and that her daughter's boyfriend, who had died from a drug overdose, had been living in the basement area where the police found the money-counting machines during a search on April 16, 1989. The parties also stipulated that Cooper was incarcerated in October 1987, and March 1988, two months during the period Kathy Sellers claimed to have delivered drugs to him.

Like Edmond and Sutton, Melvin Butler sought to undermine the credibility of Zanville. He presented evidence of Zanville's January 5, 1989, statement to an FBI agent to impeach her testimony, largely through omission.

Tony Lewis, David McCraw, John Monford, and Armaretta Perry presented no evidence.

### C. Verdict and Sentencing

On November 20, 1989, the trial judge granted Melvin Butler's motion for judgment of acquittal on Count 12, which charged him with interstate travel in aid of racketeering. On December 6, 1989, the jury convicted the appellants on all but one of the remaining charges in the indictment, acquitting James Antonio Jones of Count 4, which charged possession of cocaine with intent to distribute.

The court conducted separate sentencing hearings from September 4 through October 5, 1990. The verdicts and sentences for each appellant were as follows:

**Rayful Edmond, III** was found guilty of (1) Engaging in a continuing criminal enterprise, under 21 U.S.C. §§ 848(b), 853 (Count One); (2) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (3) Unlawfully employing a person under 18 years of age, under 21 U.S.C. § 845b (Count Five); (4) Interstate travel in aid of racketeering, under 18 U.S.C. § 1952(a) (Count Eleven); (5) Unlawful use of a communications facility, under 21 U.S.C. § 843(b) (Counts Fourteen, Fifteen, Sixteen, and Eighteen). On September 17, 1990, the District Court imposed sentences of mandatory life without parole on Count One, life without parole on Counts Two and Five, 60 months on Count Eleven, and 48 months on Counts Fourteen, Fifteen, Sixteen, and Eighteen. Edmond's sentences were to run concurrently.

**Melvin Butler** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Unlawful use of a communications facility, under 21 U.S.C. § 843(b) (Count Fifteen). On September 4, 1990, the court sentenced Butler to 405 months on Count Two, and 48 months on Count Fifteen. Butler's sentences were to run concurrently.

**Emanuel W. Sutton** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Distribution of cocaine base, 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2 (Count Twenty); (3) Unlawfully employing a person under 18 years of age, under 21 U.S.C. § 845b (Count Twenty–One). On September 6, 1990, the court sentenced Sutton to 320 months on Counts Two and Twenty–One, and 240 months on Count Twenty. Sutton's sentences were to run concurrently.

**James Antonio Jones** was found guilty of conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two). He was found not guilty of possession with intent to distribute co-

caine, under 21 U.S.C. § 841(a) and (b)(1)(C). On September 5, 1990, the court imposed a sentence of life without parole on Count Two.

**Jerry Millington** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Interstate travel in aid of racketeering, under 18 U.S.C. § 1952(a) (Count Thirteen). On September 5, 1990, the court sentenced Millington to 405 months on Count Two, and 60 months on Count Thirteen. Millington's sentences were to run concurrently.

**Tony Lewis** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Interstate travel in aid of racketeering, under 18 U.S.C. § 1952(a) (Count Eleven); (3) Unlawful use of a communications facility, under 21 U.S.C. § 843(b) (Counts Sixteen and Eighteen). On September 6, 1990, the court imposed a sentence of life without parole on Count Two, five years on Count Eleven, and four years on Counts Sixteen and Eighteen. Lewis's sentences were to run concurrently.

**Keith E. Cooper** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Distributing cocaine base, under 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2 (Count Six); (3) Unlawfully employing a person under 18 years of age, under 21 U.S.C. § 845b (Count Seven); (4) Distributing a quantity of cocaine base, under 21 U.S.C. § 841(a)(1) and (b)(1) (Count Eight); (5) Possessing with intent to distribute 50 or more grams of cocaine base, under 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii) (Count Nine); (6) Unlawfully employing a person under 18 years of age, under 21 U.S.C. § 845b (Count Ten). On September 6, 1990, the court sentenced Cooper to 320 months on Counts Two, Seven, Nine and Ten, and 240 months on Counts Six and

Eight. Cooper's sentences were to run concurrently.

**Bernice Hillman McCraw** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Unlawful use of a communications facility, under 21 U.S.C. § 843(b) (Count Seventeen). On September 4, 1990, the court sentenced McCraw to 235 months on Count Two and 48 months on Count Seventeen. McCraw's sentences were to run concurrently.

**David McCraw** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Distribution of 500 or more grams of cocaine, under 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii)(II) (Count Nineteen). On September 4, 1990, the court sentenced McCraw to 292 months on Counts Two and Nineteen to run concurrently.

**John Monford** was found guilty of conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two). On September 5, 1990, the court sentenced Monford to 405 months on Count Two.

**Armaretta Perry** was found guilty of (1) Conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, under 21 U.S.C. § 846 (Count Two); (2) Maintaining a premises for an unlawful purpose, under 21 U.S.C. § 856 (Count Three); (3) Unlawful use of a communications facility, under 21 U.S.C. § 843(b) (Count Seventeen). On September 4, 1990, the court sentenced Perry to 405 months on Count Two, 240 months on Count Three and 48 months on Count Seventeen. Perry's sentences were to run concurrently.

In addition, the jury found a basis for the forfeiture of real property located at 1009 Peconic Place, Upper Marlboro, Maryland;

14518 London Lane, Bowie, Maryland; a 1986 Chevrolet Corvette, and assorted personal property.

## II. ANALYSIS

The defendants appeal their convictions and sentences, alleging a broad array of errors in both trial procedures and sentencing. Many of appellants' claims are meritless, and we do not address them specifically. For instance, Armaretta Perry argues that her sentence for conspiracy to distribute cocaine base deprives her, as an African American, of equal protection under the due process clause of the Fifth Amendment. We recently rejected that argument in *United States v. Thompson*, 27 F.3d 671, 678 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 650, 130 L.Ed.2d 554 (1994), and need not address it here. Similarly, appellants raise a variety of groundless challenges to the sufficiency of evidence supporting individual convictions and the like. For those issues not discussed herein, we reject appellants' arguments. Instead, we turn our attention to those issues which we consider to merit separate discussion. Some pertain to individual defendants; some apply to all.

### A. Joint Issues

#### 1. Jury–Related Issues

Appellants raise a number of challenges to the District Court's method of jury selection and administration. They contend that the impaneling of an anonymous jury, the District Court's limitations on *voir dire*, and the denial of their motions for a change of venue all violated their Sixth Amendment right to trial by an impartial jury. We reject these claims.

We hold that the trial court acted within the scope of its discretion in impaneling an anonymous jury in this case. The trial judge found adequate need for juror anonymity based on the allegations in the indictment and other submissions before the court, and also because of substantial pretrial publicity. Further, he minimized any prejudicial impact of the anonymous jury by conducting an extensive *voir dire* on the subject of the prospective jurors' personal backgrounds and providing jurors with an appropriate explanation for their anonymity. As to the adequacy of the *voir dire* with respect to the effects of pretrial publicity, we agree with appellants that the District Court's inquiry fell short of the ideal. However, we find that the *voir dire* was adequate to assure the impaneling of an impartial jury in the circumstances of this case because the community was not so inflamed against appellants as to cast doubt upon the prospective jurors' own indications of impartiality. Finally, we hold that the trial court committed no error in denying appellants' requests for a change of venue because the pretrial publicity here was not so extreme as to create a presumption of prejudice.

#### a. Anonymous Jury

Appellants first contend that the District Court abused its discretion by impaneling an anonymous jury in this case. On August 25, 1989, the District Court *sua sponte* issued an order withholding from both counsel and the defendants the identities and addresses of the prospective jurors, and requiring the sequestration of the jury during trial. In a subsequent memorandum opinion, the District Court judge explained that he took this action to protect the jurors because "a realistic threat of violence is present as all defendants are allegedly members of a drug conspiracy that resorted to violence in order to achieve the conspiracy's ends." *United States v. Edmond*, 718 F.Supp. 109, 110 (D.D.C.1989). The District Court stated that preservation of juror anonymity would not impair the defendants' right to a fair and impartial jury because the demeanor of prospective jurors, along with their answers to questions posed during *voir dire*, would "provide each defendant with sufficient information to intelligently make peremptory challenges and challenges for cause during the jury selection process." *Id.* at 110–11.

In challenging this decision on appeal, appellants contend that the circumstances of this case demonstrated no need for an anonymous jury, that the use of such a jury prevented them from utilizing their peremptory challenges effectively, and that the District Court's instructions impermissibly left jurors

with the impression that the court was withholding their names and addresses to protect them from the defendants. We disagree.

The question whether a district court may impanel an anonymous jury is one of first impression in this circuit, but we draw guidance from case law developed by our sister circuits. To date, four circuits have held that anonymous juries constitutionally may be impaneled where necessary to protect the integrity of the jury's decision making process. *See United States v. Ross,* 33 F.3d 1507, 1519–22 (11th Cir.1994); *United States v. Crockett,* 979 F.2d 1204, 1215–17 (7th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993); *United States v. Scarfo,* 850 F.2d 1015, 1021–26 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Barnes,* 604 F.2d 121, 140–41 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *cf. In re Baltimore Sun Co.,* 841 F.2d 74, 76 n. 5 (4th Cir.1988) (ordering release of juror names to newspaper, but emphasizing that "we do not deal here with a situation in which there existed realistic threats of violence or jury corruption"); *Johnson v. United States,* 270 F.2d 721, 724 (9th Cir.1959) (affirming district court's refusal of defendants' request for exact address of each juror), *cert. denied,* 362 U.S. 937, 80 S.Ct. 759, 4 L.Ed.2d 751 (1960). Like these courts, we recognize that "[a]n anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." *Ross,* 33 F.3d at 1519; *see Scarfo,* 850 F.2d at 1023–26 (discussing impact of juror anonymity upon presumption of innocence); *United States v. Thomas,* 757 F.2d 1359, 1363–65 (2d Cir. 1985) (same), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), *and cert. denied,* 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986); *see also Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976) (stating that presumption of innocence "is a basic component of a fair trial under our system of criminal justice"). We also are mindful of the fact that juror anonymity denies a defendant information that might be helpful in the

exercise of his or her right to utilize peremptory challenges during *voir dire. See Barnes,* 604 F.2d at 142 ("[T]here must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise ... his peremptory challenges."). Yet, neither the right to a presumption of innocence nor the right to exercise peremptory challenges is a constitutional absolute; each, at times, must yield to the legitimate demands of trial administration and courtroom security so long as steps are taken to ensure that the defendant receives a fair trial. *See Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) (stating that "peremptory challenges are not of constitutional dimension," but rather "are a means to achieve to achieve the end of an impartial jury"); *Holbrook v. Flynn,* 475 U.S. 560, 567–68, 106 S.Ct. 1340, 1344–45, 89 L.Ed.2d 525 (1986) (recognizing that right to fair trial does not invalidate every practice tending to cast the accused in a negative light, but requiring "close judicial scrutiny" of practices threatening the "fairness of the fact-finding process") (internal quotations omitted).

◼ Accordingly, the decision to impanel an anonymous jury requires a court to "balance the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). To guide district courts in striking this balance, we adopt the test employed by several of our sister circuits, that, "[i]n general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *accord Ross,* 33 F.3d at 1520; *Crockett,* 979 F.2d at 1215. "Within these parameters, the

decision whether or not to empanel an anonymous jury is left to the district court's discretion." *Paccione*, 949 F.2d at 1192; *see also Scarfo*, 850 F.2d at 1023 (stating that appellate court reviewing decision to impanel anonymous jury "must be particularly deferential to the trial judge, familiar as he is with the local ambience").

■ Applying that standard here, we conclude that the District Court judge permissibly exercised his discretion in impaneling an anonymous jury. As to the first element of the test, we think the trial judge reasonably found a substantial need for juror anonymity. Our assessment of this issue is aided by a factorial methodology developed by the Eleventh Circuit. Under that analysis, juror anonymity is warranted upon a showing of "some combination" of five separate factors:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Ross*, 33 F.3d at 1520. At least four of these elements were present in this case. The indictment charged that appellant Edmond and the other defendants below were the primary participants in a large-scale criminal organization that distributed massive amounts of cocaine in Washington, D.C., and used violent acts to achieve its goals. Indeed, the June 20, 1989, superseding indictment charged appellant Edmond with three counts of murder, two of which also involved appellants Jones and Millington. *See* Indictment, Crim. No. 89–0162 (June 20, 1989) at 29–30, 33–34, *reprinted in* J.A. I 29–30, 33–34. While the District Court judge severed these counts and others involving violent crimes for separate trial, they certainly support his conclusion that the defendants in this trial had the capacity to harm jurors. In addition, the defendants faced penalties that are among the harshest the law can impose.

Edmond himself was charged with a crime—acting as the leader of a continuing criminal enterprise—carrying a penalty of life imprisonment. *See* 21 U.S.C. § 848(b)(1). Finally, as appellants emphasize in contesting the denial of their motion for a change of venue, this prosecution, involving what prosecutors called the largest cocaine distribution operation in the history of the nation's capital, attracted substantial pretrial publicity that the District Court understandably expected to continue throughout the trial.

■ Appellants, however, argue that an anonymous jury was unnecessary in this case because of what they perceive as the absence of any evidence that they had a history of, or inclination toward, jury tampering. We are not persuaded. While we recognize that a defendant's history of jury tampering has played a critical role in some appellate court decisions upholding the use of anonymous juries, *see, e.g., United States v. Vario*, 943 F.2d 236, 240 (2d Cir.1991) (affirming use of anonymous jury where defendant was charged with grand jury tampering), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Tutino*, 883 F.2d 1125, 1132–33 (2d Cir.1989) (affirming use of anonymous jury where defendant was personally involved in jury tampering in prior case), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990), we do not believe such evidence is necessary in every case. Rather, we think the District Court in this case reasonably could have ascertained a threat to jurors from the charges in the indictment.

Even were we to require some evidence of a defendant's inclination toward jury tampering, however, we think such evidence existed in the record before the District Court. Before ordering juror anonymity in this case, the trial judge received from the Government an *in camera* submission describing threats to witnesses. This submission stated that two confidential sources had reported that Edmond's father intended to "take care of the witnesses" in the case, and that a caller falsely representing herself as a relative of Alta Rae Zanville, an important Government witness, had telephoned an assistant United States attorney in an effort to elicit informa-

tion about Zanville's whereabouts. *See* Submission in Response to Court Order of July 31, 1989 Regarding Safety of Witnesses at 1, *reprinted in* J.A. XVIII 1. Numerous court decisions illustrate that such information, indicating a general willingness to obstruct justice on the part of a defendant or his associates, is more than adequate to suggest a real possibility that a defendant will threaten or otherwise tamper with jurors. *See United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995); *United States v. Wong,* 40 F.3d 1347, 1376–77 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1968, 131 L.Ed.2d 858 and *cert. denied,* —— U.S. ——, 115 S.Ct. 1968, 131 L.Ed.2d 858; *Ross,* 33 F.3d at 1520–21; *Amuso,* 21 F.3d at 1264; *Crockett,* 979 F.2d at 1216; *Paccione,* 949 F.2d at 1193; *Scarfo,* 850 F.2d at 1017; *Thomas,* 757 F.2d at 1364. Given this information, we cannot fault the District Court for acting on an assumption that an anonymous jury was necessary.

■ We reject appellants' assertion that sequestration alone would have sufficed to protect the jurors in this case. Although sequestration might have addressed the District Court's concerns with juror safety during the trial itself, it would have done nothing to insulate jurors against retaliatory attacks after the guilty verdict was rendered. "As a practical matter, we cannot expect jurors to 'take their chances' on what might happen to them as a result of a guilty verdict." *Thomas,* 757 F.2d at 1364; *see also Barnes,* 604 F.2d at 141 ("Sequestration would have been no protection in the event of a guilty verdict."). We also reject appellants' contention that the District Court erred in failing to hold a hearing before ordering juror anonymity. Although a hearing might be required where the need for juror anonymity is doubtful, here the allegations in the indictment and other submissions to the court adequately justified the use of precautionary measures, and the District Court was not obliged to conduct "a trial within a trial to determine whether the alleged wrongdoing could be proven to have occurred." *Thomas,* 757 F.2d at 1365; *see also United States v. Eufrasio,* 935 F.2d 553, 574 (3d Cir.) ("A trial court has discretion to permit an anonymous jury without holding an evidentiary hearing on juror safety, if the court believes there is potential for juror apprehension."), *cert. de-*

*nied,* 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).

Turning to the second element of the test governing impanelment of an anonymous jury, we hold that the District Court took reasonable steps to minimize any prejudicial effects on appellants and to protect their fundamental rights. First, the District Court sought to protect appellants' right to exercise peremptory challenges by conducting an extensive *voir dire* with respect to the jurors' personal backgrounds. The District Court required every prospective juror to complete a 20–page questionnaire that inquired into a broad variety of personal information, including the quadrant of the city in which jurors resided, their educational history, marital status, military service, employment status and work description, their spouse's and children's employment, and their experience with crime, drugs, and law enforcement. *See* J.A. IV 1–228. As we discuss below in assessing appellants' challenge to the sufficiency of the District Court's jury selection procedures, the *voir dire* in this case was imperfect in some respects due to its limited inquiry into the prospective jurors' exposure and reaction to pretrial publicity. However, the flaws we discern in this aspect of the *voir dire* are irrelevant to our analysis of the alleged prejudice created by juror anonymity. The *voir dire* employed by the District Court was more than adequate to compensate for the information denied by juror anonymity. It elicited information about the prospective jurors' habits, activities, work experiences, and families that was far more extensive and detailed than the generalizations appellants might have drawn from jurors' mere names and addresses. Thus, it sufficed to enable appellants to make effective use of their peremptory challenges. *See Scarfo,* 850 F.2d at 1022–23 (agreeing with district court that written questionnaire addressing juror demographics left counsel "in a much better position to assess the suitability of prospective jurors in this case than in most other trials, criminal or civil") (internal quotations omitted); *see also Crockett,* 979 F.2d at 1216 ("[A] defendant's fundamental right to an unbiased jury is adequately protected by the

court's conduct of a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself.") (internal quotations omitted); *Paccione,* 949 F.2d at 1192 (same).

The District Court also adequately addressed any burden that the anonymous jury imposed on appellants' presumption of innocence by giving jurors an instruction that minimized the significance of their anonymity. Before jurors filled out their questionnaires, the District Court instructed them that

[i]t is a common practice followed in many cases in the Federal court to keep the names and the identities of the jurors in confidence. This is [in] no way unusual. It is a procedure being followed in this case to protect your privacy even from the Court.

*United States v. Edmond,* Crim. No. 89–0162, slip op. at 2 (D.D.C. Sept. 5, 1989) (Preliminary Statement To Be Read To Jury Venire) ("Preliminary Instruction"), *reprinted in* J.A. I 259. By instructing jurors that the use of an anonymous jury was routine, the District Court avoided the possibility that jurors would view the procedure as an extraordinary precaution signaling a threat from the defendants and, inferentially, the defendants' guilt. *See Tutino,* 883 F.2d at 1133 (holding that identical instruction was "sufficient to ensure that the jury would not draw improper conclusions from the preservation of their anonymity"). In addition, the District Court immediately followed its anonymity discussion by instructing jurors that the defendants enjoyed a presumption of innocence, and repeated that instruction both at the beginning and conclusion of the trial. *See* Preliminary Instruction at 3, *reprinted in* J.A. I 260; Trial Tr. (Sept. 18, 1989) at 46, *reprinted in* J.A. VIII; *id.* (Dec. 1, 1989) at 74, *reprinted in* J.A. XVII. This step further mitigated any prejudice from the anonymous jury procedure. *See Tutino,* 883 F.2d at 1133; *see also Crockett,* 979 F.2d at 1216 (finding repeated instructions on presumption of innocence to protect defendant from possibility of prejudice resulting from impanelment of anonymous jury); *Vario,* 943 F.2d at 241 (holding that trial court took adequate

steps to safeguard defendant's presumption of innocence where judge failed to instruct jurors as to reason for their anonymity, but fully instructed them on presumption of innocence).

Nevertheless, appellants find fault in the District Court's instructions with respect to sequestration of the jury and discussion of the case. During the courtroom phase of the *voir dire,* the District Court told jurors that,

[b]ecause of the close scrutiny and legitimate interest by the press and others in this case, and in order to avoid any outside or extra-judicial pressures or conduct which might affect the integrity of the right to a trial by jury process, the Court has decided to sequester the jury from the time of its selection until the conclusion of the trial and the conclusion of the jury's deliberations.

Hearing Tr. (Sept. 11, 1989) at 1902, *reprinted in* J.A. VII. Later, in admonishing jurors not to discuss the case during a lunch break that interrupted the judge's final instructions, the District Court stated:

I have told you from the beginning not to discuss the case. I have told you that I would tell you when it is appropriate to discuss the case. It's not appropriate to discuss the case, but again, just like the fact that your anonymity has been preserved and that you've been sequestered, I am going to ask the marshal to be with you during the luncheon recess, not because nobody mistrusts you but to protect you.

Trial Tr. (Dec. 1, 1989) at 93–94, *reprinted in* J.A. XVII. Appellants insist that the District Court's references to "outside or extra-judicial pressures" and to the need for a marshal to "protect" jurors during a lunch break conveyed the message that the trial judge perceived a threat from the defendants.

We think appellants infer too much from the trial judge's statements. Prefaced as it was by a discussion of press interest in the case, the District Court's reference to "outside or extra-judicial pressures" would not naturally have singled out the defendants as the source of such pressures. Nor would the District Court's statement that a marshal would "protect" the jurors during their lunch

break necessarily have cast a shadow of guilt upon the defendants. We recognize that a trial judge's acknowledgment that the jury requires protection always has the potential to reflect negatively upon a defendant. However, the instruction here appears more than anything to have been a palliative designed to soften the inference that the trial judge felt some supervision was necessary to prevent jurors from discussing the case. In any event, given the totality of the court's instructions, we think the jurors most naturally would have interpreted the District Court's statement consistently with the court's earlier explanation for juror anonymity—*i.e.*, that the court was taking all measures necessary to "protect [the jurors'] *privacy*" from all parties, "even from the Court." Preliminary Instruction at 2 (emphasis added), *reprinted in* J.A. I 259.

In sum, we find no error in the District Court's decision to impanel an anonymous jury. Even appellants agree that this was an unusual case for a number of reasons, including the size of the alleged drug conspiracy, the seriousness of the charges, and the large amount of corresponding publicity. For these reasons and the others that we have stated, the District Court's unusual decision to impanel an anonymous jury was not an abuse of discretion.

#### b. Voir Dire

Appellants next argue that the District Court's manner of conducting *voir dire* in this case was insufficiently probing with respect to the effects of pretrial publicity. As we have discussed, the arrest and prosecution of Edmond and his codefendants generated substantial news coverage. Appellants cite approximately 50 news reports dealing in some way with Edmond or his co-defendants that were published during the five-month period between Edmond's arrest and the beginning of appellants' trial, and they point out that some reports linked Edmond and other appellants to Colombian drug cartels and as many as 30 homicides. In the wake of such publicity, appellants contend, the District Court's manner of conducting *voir dire*, which consisted of administration of the previously discussed questionnaire followed by generalized questioning of groups of prospective jurors, was inadequate to ensure that the jury ultimately impaneled was free from prejudice against the defendants. Although we agree that the *voir dire* with respect to pretrial publicity was imperfect, we reject appellants' argument that the shortcomings in the trial judge's inquiry were so serious as to constitute an abuse of discretion under the circumstances of this case.

The Sixth Amendment right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," but it does not require "that the jurors be totally ignorant of the facts and issues involved." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723, 81 S.Ct. at 1643. Our cases recognize that protection of this right "demands that *voir dire* examination serve as a filter capable of screening out" those jurors whose prejudice against the defendants renders them incapable of performing this function. *United States v. Liddy,* 509 F.2d 428, 434 (D.C.Cir.1974) (*en banc*), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion).

Despite the significance of *voir dire* as a safeguard against juror bias, however, the trial judge's administration of this process "is not easily subject to appellate review." *Mu'Min v. Virginia,* 500 U.S. 415, 424, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991) (quoting *Rosales–Lopez,* 451 U.S. at 188, 101 S.Ct. at 1634). As the Supreme Court has observed,

> [t]he trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an ap-

pellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.

*Rosales–Lopez,* 451 U.S. at 188, 101 S.Ct. at 1634 (citations omitted). The trial judge also is far more likely than an appellate court to be familiar with the atmosphere surrounding the trial, and the resulting potential for juror prejudice from publicity, racial issues, or other factors. For this reason, we generally defer to the District Court's determinations as to the questions to be asked of prospective jurors. *See Mu'Min,* 500 U.S. at 424, 111 S.Ct. at 1904 ("[T]he trial court retains great latitude in deciding what questions should be asked on *voir dire.*"); *see also* FED.R.CRIM.P. 24(a) (providing that, in examining prospective jurors, district court may ask such questions "as it deems proper"). It is well-established in this circuit that "[t]he trial judge, acting under Rule 24(a), Fed.R.Crim.P., is accorded broad discretion to mold the manner and mode of *voir dire* examination, to fit the demands of the case at hand, and provides no basis for reversal unless he abuses his discretion, and there is substantial prejudice to the accused." *Liddy,* 509 F.2d at 434–35 (footnotes omitted); *accord United States v. Washington,* 705 F.2d 489, 495 (D.C.Cir.1983); *United States v. Haldeman,* 559 F.2d 31, 64–65 (D.C.Cir.1976) (*en banc*), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Robinson,* 475 F.2d 376, 380 (D.C.Cir.1973); *United States v. Bryant,* 471 F.2d 1040, 1044 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973).

While we grant district courts wide latitude in the conduct of *voir dire,* however, we have established rules to guide their discretion in cases involving substantial pretrial publicity to ensure that the trial judge's procedures meet "the essential demands of fairness." *Haldeman,* 559 F.2d at 64 (internal quotations omitted). In *Bryant,* 471 F.2d at 1044–45, we endorsed a recommendation of the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, which requires individual examination of jurors regarding pretrial publicity "[w]henever there is believed to be a significant possibility that

individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material." ABA Standards, Fair Trial and Free Press § 3.4(a) (1968). As we made clear in *Liddy,*

> [w]hether such a "significant possibility" exists in a given case depends on such circumstances as the amount and pervasiveness of the publicity, its tone or quality, its proximity to the date of trial, and the nature of the particular case. The totality of the circumstances controls whether the likelihood of prejudice is too great to permit the jurors' avowals of impartiality to be accepted.

509 F.2d at 435 (footnote omitted). We think another circumstance to be considered in assessing the "significant possibility" of juror ineligibility arises where, as here, one factor supporting impanelment of an anonymous jury is a concern over extensive trial publicity. In such cases, the trial judge obviously must be alert to the danger that media attention of a level sufficient to support the use of an anonymous jury may bring prospective jurors before the court with biases against the defendants already established.

■ The *voir dire* conducted by the District Court in this case barely satisfied the minimum requirements under these standards. We agree with appellants that the District Court's inquiry was less than ideal in a number of ways. However, in the circumstances of this case, we do not think that the flaws in the District Court's *voir dire* procedures were so egregious as to constitute an abuse of the trial judge's broad discretion. As we have discussed, the District Court began *voir dire* in this case by asking prospective jurors to fill out 20–page questionnaires. These questionnaires asked about the prospective jurors' exposure to various media, inquiring as to the newspapers and television programs most regularly read and viewed by each juror and the number of hours per day devoted to each. However, the questionnaires did not ask prospective jurors whether they had learned of the defendants or the case by virtue of their exposure to such media. Rather, the questionnaire's sole inquiry regarding the prospective jurors' knowledge of the case was a question that presented a list of 33 names, including those of the defendants, and then asked each

member of the venire whether he or she "personally, or any member of [their] immediate family, know or have any connection (personal, business, or social) with any of these individuals, or have heard of any of them." J.A. IV 16. The question then asked the prospective jurors to state how they knew, were connected with, or had heard of the persons whose names they recognized. *See id.* Of the 218 prospective jurors who responded to this question, 68 had heard of at least one defendant due to pretrial publicity, 11 either knew one of the defendants through personal contacts or failed to answer the question coherently, and 139 never had heard of any of the defendants from any source. *See* Final Brief for Appellee at 79.

Appellants contend that these results shed no light on the impact of pretrial publicity in this case because of the indirect phrasing of the questionnaire's inquiries. We agree that, as a general matter, inquiries such as these are too oblique to yield a thorough assessment of the effects of media coverage upon the venire. Questions regarding the prospective jurors' general exposure to various media may allow for speculation as to whether such jurors have been exposed to pretrial publicity, but they hardly substitute for direct questions asking whether members of the venire have read or seen reports about the case, and what opinions they have formed as a result. Moreover, prospective jurors may not automatically recognize that a question asking whether they have "heard of" the defendants is probing for knowledge gained through media reports, especially where, as here, such a question is embedded in an inquiry as to whether members of the venire personally know or have any connection with the defendants.

However, to acknowledge that the District Court's method of inquiry was less than ideal as a general matter is not to say that it constituted reversible error in this case. We conclude that, in the circumstances presented here, the District Court's questions adequately measured the venire's exposure to pretrial publicity. As numerous media reports make clear, this prosecution was known from the beginning as the "Rayful Edmond case," or simply "the Edmond case," and Edmond's name was featured prominently in nearly every article and broadcast about the progress or background of the case. *See, e.g.,* Nancy Lewis, *Edmond, 28 Others Indicted in Drug Ring,* WASH. POST, May 16, 1989, at B1; Mike Folks, *Judge Shields Witnesses in Edmond Cocaine Case,* WASH. TIMES, Apr. 27, 1989, at B2; Nancy Lewis, *Possible Conflicts Delay Hearing in Edmond Case,* WASH. POST, Apr. 20, 1989, at D1. Because the media had seized upon Edmond's name as a label for the case as a whole, the trial court's practice of asking jurors whether they had "heard of" any of the defendants—including Edmond—was reasonably likely to gauge the number of prospective jurors who had learned about the case through news reports. In addition, the fact that 68 of the 218 members of the venire responded to this question by explaining that they had heard of one or more of the defendants through the media indicates that prospective jurors understood the questionnaire to call for responses based on their knowledge of the defendants from any source— including pretrial publicity.

■ Appellants also argue that the oral portion of the *voir dire* was deficient due to its generalized questioning of groups of jurors and the compound form of the trial judge's question regarding publicity. After the prospective jurors had completed their questionnaires, the District Court divided them into several large groups for questioning. The trial judge asked each group a series of questions, one of which dealt with pretrial publicity. Although the wording of this question varied slightly on each occasion it was asked, a representative sample is the following:

> Now as to those of you who may have read or seen something about this case, the question, therefore, is whether you would be able to put aside anything you might have read or heard about this case before this very moment and render a fair and impartial verdict based solely on what you see and hear in this courtroom after you are selected.
> I will assume that all of you, for the moment, have read about this or similar cases. I will further assume that those of you who do not rise at this point, . . . even

though you have read or seen something in the electronic or print media, as good citizens of this community, agree, if selected, to render a fair and impartial verdict based solely on the evidence in this case.

If you cannot do that, please rise at this time and come forward to the bench.

Hearing Tr. (Sept. 12, 1989) at 2089, *reprinted in* J.A. VII. The trial judge and counsel individually questioned those prospective jurors who rose in response to this general question about publicity, as well as other questions, at the bench.

This style of questioning hardly commends itself. The trial judge's inquiry failed to ask directly whether prospective jurors had been exposed to pretrial publicity; instead, the judge conflated that question with the broader inquiry whether, notwithstanding their presumed exposure to such publicity, they could render a verdict based solely on the evidence adduced at trial. Not only does such questioning confuse the two lines of inquiry, but it allows jurors to assess their own impartiality before the court even has determined the extent of their exposure to the media. Indeed, this latter flaw alone can rise to the level of reversible error in cases where extreme pretrial publicity has inflamed the local community against the defendants. *See Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed."); *see also United States v. Davis,* 583 F.2d 190, 197 (5th Cir.1978) ("The juror is poorly placed to make a determination as to his own impartiality."); *Silverthorne v. United States,* 400 F.2d 627, 639 (9th Cir.1968) ("[W]hether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness without something more.") (emphasis omitted).

Here, however, the District Court simply was not confronted with such a "wave of public passion engendered by pretrial publicity" as to cast doubt upon the prospective jurors' own indications of impartiality. *Mu'Min,* 500 U.S. at 429, 111 S.Ct. at 1907

(internal quotations omitted). The results of the *voir dire* itself demonstrate that the community was not inflamed against the defendants. As we have discussed, less than a third of all prospective jurors ever *had heard of* any of the defendants from the media, much less formed an opinion about their guilt. In addition, of 68 jurors struck for cause by the trial judge, only 12 stated that pretrial publicity had prejudiced them against the defendants. By contrast, cases in which courts have discounted juror claims of impartiality have involved venires far more severely infected by pretrial publicity than the panel at issue here. In *Irvin,* for example, the Supreme Court accorded "little weight" to jurors' claims of impartiality where 268 members of a 430–person venire were excused for cause after admitting that they harbored "fixed opinions as to the guilt of petitioner," and "almost 90% of those examined on the point . . . entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." 366 U.S. at 727, 728, 81 S.Ct. at 1645. Other cases, though presenting less extreme circumstances than *Irvin,* also have involved more pervasive publicity than existed in this case. *See, e.g., Jordan v. Lippman,* 763 F.2d 1265, 1269, 1281 (11th Cir.1985) (discounting "conclusory protestation[s] of impartiality" where "a vast majority of the potential jurors had heard of or read about the prison riot" involved in the case); *Davis,* 583 F.2d at 196 ("Each juror had been exposed to some [pretrial] publicity."); *Silverthorne,* 400 F.2d at 639 ("Every juror had acquired *some* knowledge of the case; almost thirty per cent of those examined expressed opinions of appellant's guilt.").

Appellants point out that, of the 12 jurors who actually deliberated in the case, four acknowledged in response to the questionnaire that they had heard of at least Edmond from pretrial publicity, but none was individually questioned. However, as we have discussed, the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely prejudicial pretrial publicity. In *Mu'Min,* for example, "8 of the 12 jurors who sat answered that they had read or heard some-

thing about the case, but none of those 8 indicated that he had formed an opinion as to guilt, or that the information would affect his ability to judge petitioner solely on the basis of the evidence presented at trial." 500 U.S. at 428, 111 S.Ct. at 1907. The *Mu'Min* Court found no reason to doubt the jurors' responses because pretrial publicity, although extensive, had not inflamed the community against the defendant. *Id.* at 429–30, 111 S.Ct. at 1907–08. We reach the same conclusion here. Put simply, this was *not* a case where jurors' claims of impartiality rang hollow because "so many, so many times, admitted prejudice." *Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645.

In these circumstances, our decision in *Liddy* indicates that the method of questioning employed by the trial judge here is within the limits of the discretion this circuit accords district courts in the conduct of *voir dire.* In reviewing the conviction of G. Gordon Liddy on charges relating to the burglary and wiretapping of the offices of the Democratic National Committee, the *Liddy* court considered the propriety of a *voir dire* involving "general questions addressed to the entire array, followed by individual questioning of those who responded affirmatively to any of the initial inquiries, and thus raised the possibility they might have formed an opinion on the case." *Liddy,* 509 F.2d at 436. This *voir dire* occurred in an environment in which "virtually all of the veniremen had some knowledge of the case," but group questioning revealed that only "eleven of the then 117 prospective jurors acknowledged having formed an opinion regarding guilt or innocence." *Id.* at 436–37 & n. 17. Further, subsequent individual questioning of eight prospective jurors professing some knowledge of pretrial publicity demonstrated that "most knew little about the case." *Id.* at 437. We distinguished these circumstances from cases where venires were tainted by "pervasive, inflammatory publicity," and held that, "[a]lthough the trial judge recognized that the Watergate matter had been publicized extensively, he did not abuse his discretion in declining the defendants' request that all the veniremen who had heard anything about the case be examined individually." *Id.* at 436 (footnote omitted); *see also Bryant,* 471 F.2d at 1044 (approving *voir dire* involving "the

usual, unexceptional, general questions of the jurors *en masse* and then calling the prospective jurors who had made an affirmative response to the questions to the bench for further interrogation outside the hearing of the other veniremen"). As was the case in *Liddy,* the trial court here conducted generalized questioning of groups of jurors, followed by individual questioning of those whose responses indicated "they might have formed an opinion on the case"—*i.e.,* those for whom there was a "significant possibility" of ineligibility in the terms of the ABA standard—in circumstances where the prospective jurors' answers indicated that relatively few were prejudiced by pretrial publicity.

Appellants, however, pay little attention to *Liddy,* and instead seek to analogize this case to our decision in *Haldeman,* 559 F.2d at 31. In that case, which, like *Liddy,* involved "extraordinarily heavy coverage in both national and local news media" relating to the Watergate affair, we approved of a far more searching method of *voir dire* involving individual questioning of 77 prospective jurors "on matters such as their employment, attitudes toward the defendants, and exposure to pretrial publicity." *Id.* at 59, 65 (footnote omitted). In so doing, as appellants emphasize, we even commented that "it would have been reversible error for the court to accept jurors simply because they said they would be fair." *Id.* at 67 n. 51. However, we think appellants overlook a critical distinction between *Haldeman* and this case. While less than a third of the prospective jurors here even had heard of appellants, approximately one third of the venire in *Haldeman* was *predisposed against* the appellants in that case. 559 F.2d at 70 n. 56. Thus, concerns over juror bias were much more immediate in *Haldeman* than in this case (or, for that matter, in *Liddy* ), and a more extensive *voir dire* was required. For these reasons, we conclude that *Liddy,* rather than *Haldeman,* presents the most apt analogy to the present case. Accordingly, like the *Liddy* court, we hold that the District Court did not abuse its discretion in conducting the *voir dire.*

In sum, although the method of *voir dire* employed by the District Court fell short of the ideal, we hold that, in the totality of the

circumstances, it was adequate to assure the impaneling of a jury that could render a judgment based solely on the evidence adduced at trial. However, we wish to emphasize that our approval of the trial court's actions is inextricably linked to the particular circumstances of this case. We caution trial judges not to test the outer limits of their discretion—especially where juries are sequestered and anonymous. In particular, we admonish district court judges to avoid asking compound questions of prospective jurors. Where a defendant's constitutional right to a fair trial is at stake, the better practice is to err on the side of a *voir dire* that is simple, direct, and thorough.

### c. Change of Venue

■ Finally, appellants challenge the District Court's denial of their motions for change of venue, asserting that extensive pretrial publicity established a presumption of prejudice against them. We think that what we already have said with respect to the adequacy of the *voir dire* suffices to refute appellants' claim. Neither the nature nor the impact of the publicity in this case presented the "extreme circumstances" necessary to establish a presumption that a fair trial was impossible in this jurisdiction. *Haldeman,* 559 F.2d at 60 (internal quotations omitted); *cf. Rideau v. Louisiana,* 373 U.S. 723, 724–26, 83 S.Ct. 1417, 1418–19, 10 L.Ed.2d 663 (1963) (finding presumption of prejudice where defendant's filmed confession to bank robbery, kidnapping, and murder was broadcast three times to large audiences in parish with population of 150,000). We note, in particular, that approximately two-thirds of the news reports upon which appellants relied in urging a change of venue before the District Court never even mentioned them, but rather dealt more generally with drug-related issues. For these reasons, we conclude, as did the *Haldeman* court, that there is "no reason for concluding that the population of Washington, D.C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial" that a change of venue was required. 559 F.2d at 62.

### 2. Judicial Bias

Appellants claim that the trial judge showed bias against them in the enforcement of procedural restrictions, comments to defense counsel, and nonverbal "conduct" so prejudicial as to deprive them of due process under the Fifth Amendment. We disagree.

In reviewing a claim of judicial bias, we must determine "whether the judge's behavior was so prejudicial that it denied [appellants] a fair, as opposed to a perfect, trial." *United States v. Logan,* 998 F.2d 1025, 1029 (D.C.Cir.) (quoting *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985), *cert. denied,* —— U.S. ——, 114 S.Ct. 569, 126 L.Ed.2d 469 (1993)). As the threshold for a showing of bias is high, we need not decide "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." *Id.* (quoting *Pisani,* 773 F.2d at 402). We require that a judge remain a "disinterested and objective participant in the proceedings," *United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir.) (citations omitted), *cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989), but we also acknowledge that "a trial judge has a 'duty to prevent improprieties during the trial,'" *Logan,* 998 F.2d at 1029 (quoting *United States v. Warner,* 955 F.2d 441, 449 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3050, 120 L.Ed.2d 917 (1992)), and "may rebuke counsel for improper behavior," *id.* (citing *United States v. Jackson,* 627 F.2d 1198, 1206 (D.C.Cir.1980)). A finding of judicial bias must be based on "an abiding impression left from a reading of the entire record," *Offutt v. United States,* 348 U.S. 11, 12, 75 S.Ct. 11, 12, 99 L.Ed. 11 (1954), not from particular comments or rulings considered in isolation, *United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986).

### a. Procedural Restrictions

■ The trial judge imposed a pretrial Order on September 11, 1989, establishing restrictions on evidentiary objections and bench conferences. The Order provided that

[e]videntiary objections shall not be argued in the presence of the jury. Counsel shall

only state the basis for their objection ... or the rule of evidence relied upon. If a lawyer believes that it is absolutely essential that he or she approach the bench to explain his or her evidentiary objection in greater detail, the lawyer shall make such a request to the Court.... Motions in limine shall be made in writing, except for good cause, with citations to relevant and controlling authority.

*United States v. Edmond,* Crim. No. 89–0162, at 2 (D.D.C. Sept. 11, 1989) (Trial Order), *reprinted in* J.A. I 263.

While conceding that the Order is neutral on its face, appellants claim that the judge selectively enforced the Order by denying defense attorney requests for bench conferences, requiring certain motions *in limine* to be made in writing, and preventing defense counsel from making continuing objections to a line of questioning. We reject these claims. The trial judge's strict enforcement of procedural restrictions in no instance exceeded his "duty to require *all* counsel ... to abide by the orders [he] issued and to adhere to the rules of evidence and procedure." *Logan,* 998 F.2d at 1029. *See also Norris,* 873 F.2d at 1526 ("[t]he precepts of fair trial and judicial objectivity do not require a judge to be inert. The trial judge is properly governed by the interest of justice and truth, and is not compelled to act as if he were merely presiding at a sporting match.") (quoting *Liddy,* 509 F.2d at 438).

The record belies the claim that the judge created an "appearance of partiality" by overwhelmingly denying defense requests for bench conferences. Despite the court's order that requests for conferences be made only if "absolutely essential," defense counsel asked to approach hundreds of times, and were granted access over 200 times in the jury's presence. Appellants do not claim that a greater percentage of government requests than defense requests were granted, but even if that were the case such a disproportion would be insufficient by itself to establish bias. *See United States v. Pisani,* 773 F.2d at 402 ("[A] trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant.") Nor do

appellants cite any instance where the judge's refusal to interrupt testimony for a bench conference resulted in the admission of prejudicial evidence which otherwise would have been excluded. *See id.* at 403.

In many instances where requests for bench conferences were denied, counsel was permitted to approach or state the grounds for an objection shortly after the denial. In numerous other cases, the record makes clear that the grounds for the request were known to the judge at the time of the ruling. The court's refusal to grant a bench conference in these instances reflects not bias, but simply the rejection of defense counsel's legal arguments.

Appellants' claim that the rule requiring motions *in limine* to be made in writing created an appearance of bias is similarly unpersuasive. The rule was neutrally fashioned to apply to all objections, not just defense objections. In both of the instances cited by appellants, defense counsel's attempt to circumvent the rule provoked the ensuing heated exchange with the judge, and even then the judge did nothing more in front of the jury than request that counsel follow the terms of the order. *Cf. Logan,* 998 F.2d at 1029 (judge's duty to require counsel to abide by her orders); *Pisani,* 773 F.2d at 402–03 (no prejudice where judge requires parties to make extensive objections by written note "to avoid distracting the court and jury from the examination of witnesses," in keeping with the trial judge's "wide discretion to adopt methods designed to expedite a trial"). In both cases, defense counsel had the opportunity to speak with the judge and express their views fully moments after the denial of their oral motions. In light of these factors, we think it cannot reasonably be said that these incidents showed the judge to be in any way prejudiced against the defense.

Finally, we reject appellants' assertion that the court's refusal to allow continuing objections to a line of testimony created an appearance of partiality. Appellants cite only two occasions where the court so ruled: in both cases defense counsel's initial objection to the admission of witness testimony was denied, and in both the judge simply refused the request without making any comment susceptible to an inference of prejudice. We

also agree with the Government that there are reasonable grounds upon which the trial court might have determined not to allow continuing objections—for example, that they are imprecise, and that appellants might have been prejudiced on appeal from application of the "plain error" standard of review to "vague" objections below. *See, e.g., Logan,* 998 F.2d at 1030; *United States v. Pryce,* 938 F.2d 1343, 1350 (D.C.Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). Such concerns more than counterbalance appellants' claim that the denials made them look "foolish" for repeatedly objecting. In any case, the court did grant continuing objections on occasion, and at several points during the trial also gave *sua sponte* instructions (for example, telling jurors not to "hold it against lawyers for seeking out rulings from the court, because that's appropriate and proper") to minimize the impact of any prejudice arising from repeated objections.

### b. Judge's Comments and "Non–Verbal Conduct"

■ Appellants next assert that the record is "replete" with instances showing the judge's hostile attitude toward the defense, expressed both verbally and through facial expression, in and outside the jury's presence. The cumulative effect of the "berating, threatening, and belittling" of defense counsel, appellants maintain, was to prejudice the jury against the defense. While a judge's comments before the jury are subject to "special scrutiny" on a claim of bias, *United States v. Dellinger,* 472 F.2d 340, 386 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), they must be highly prejudicial before they will be deemed to show judicial bias. *Cf. Liteky v. United States,* — U.S. —, —, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994) ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.... [But] they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.").

■ In rejecting a judicial bias claim in *Logan,* we did not articulate a precise standard, but we noted that the "exchanges" that the jury heard between judge and counsel "involved sustaining of objections, denying of motions and ordering the rephrasing of questions to witnesses," and that the judge's comments were directed at defense counsel, not at the defendants themselves. 998 F.2d at 1029. Other factors relevant to our bias inquiry include the "enormous pressures" on trial judges, which can "on occasion cause even the most imperturbable judge to vent irritation or impatience that ideally should be suppressed," *Pisani,* 773 F.2d at 403, and the provocation of the judge by defense counsel who "continu[e] to do things that the court had specifically cautioned [them] to avoid." *Id.* at 404.

We have thoroughly reviewed the record, including the instances cited by appellants, and find absolutely no evidence to support the claim that the judge's comments revealed prejudice against the defense. All of the challenged remarks in this case, as in *Logan,* were directed at defense counsel, not at the defendants. Many (*e.g.,* "a leading question is a question which suggests the answer," "Your question is wholly improper") are similar to comments at issue in cases where our sister circuits have rejected judicial bias claims. *See, e.g., United States v. DiTommaso,* 817 F.2d 201, 220–21 (2d Cir.1987); *United States v. Williams,* 809 F.2d 1072, 1086–90 nn. 11–17 (5th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 228, 229, 98 L.Ed.2d 187 (1987); *United States v. Shelton,* 736 F.2d 1397, 1402–05 (10th Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). As to several others, we agree with the Second Circuit that "reversal is not mandated where ... rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was being handled." *DiTommaso,* 817 F.2d at 220 (citations omitted). Several supposedly hostile remarks (such as, for example, the judge's instruction to counsel that "nobody is stopping you [from asking questions of a witness], as long as you do it properly") "involved sustaining objections, denying of motions and ordering the rephrasing of questions to witnesses," *Logan,* 998 F.2d at 1029, and were squarely within the District Court's discretion in controlling the conduct of the trial.

In the course of a three-month trial that produced some 20,000 pages of transcript, we can find no single example where the trial judge "berated" or "belittled" defense counsel in the manner appellants describe. The most extreme remarks—such as the judge's comment to one defense counsel that "we see a lot of things differently, but that's all right," or his statement to another that "I have ruled, and you know the law, or presume to know it, anyhow"—do not even come close. In both instances the comments, while perhaps gratuitous, were direct responses to defense counsel's disruptive behavior; in the first, to counsel's claim that the judge was "hollering" at him, and in the second, to counsel's fifth successive demand that the judge explain why he sustained a government objection. On no occasion was the judge's conduct here analogous to the language in *United States v. Spears*, 558 F.2d 1296 (7th Cir.1977) (per curiam), upon which appellants rely. *See id.* at 1297 (Judge to counsel: "You're not at 26th St. now, you're here, and you behave yourself ... or I'll touch you where it hurts, and that will be in your pocketbook.... Who do you think you are?").

Even if one were to conclude—which we do not—that any of the challenged remarks were themselves prejudicial, the impact on the jury of such a small number of instances as are cited here would have been minimal or lost in the course of the lengthy trial. *See United States v. Turner*, 975 F.2d 490, 492–93 (8th Cir.1992) (32 instances "relatively insignificant" in 38–day trial), *cert. denied*, —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *United States v. Centracchio*, 774 F.2d 856, 859–60 (7th Cir.1985) (17 brief excerpts "all but lost" in 2,000–page trial transcript). *Compare United States v. Dellinger*, 472 F.2d at 387 n. 83 (bias charge sustained where 150 of "several hundred" comments disparaging defense were made in jury's presence). The judge's instruction to the jury during the trial that "this is not a popularity contest," and his admonition not to draw any inferences from his rulings on objections or comments to counsel, would also have counteracted any prejudice arising from an appearance of bias. *See Logan*, 998 F.2d at 1029; *Turner*, 975 F.2d at 493;

*Williams*, 809 F.2d at 1088; *Pisani*, 773 F.2d at 404.

We are also unpersuaded by appellants' argument that the judge's treatment of defense counsel outside the jury's presence is relevant to their bias claim. We agree with the First and Second Circuits, that "[e]ven if unwarranted, a judge's reprimand of counsel furnishes no basis for reversal if made outside of the jury's presence." *DiTommaso*, 817 F.2d at 221 (citations omitted); *Harris v. United States*, 367 F.2d 633, 636 (1st Cir. 1966), *cert. denied*, 386 U.S. 915, 87 S.Ct. 862, 17 L.Ed.2d 787 (1967). This position is consistent with our decision in *Logan*, where we noted in rejecting a bias claim that "the jury *never heard*" many of the allegedly hostile comments. 998 F.2d at 1029. In any event, we do not think that the 20 occasions can be fairly claimed to have "necessarily chilled" defense counsel's "vigorous advocacy." In virtually all of these instances, the judge's expression of annoyance with defense counsel—and, on occasion, with the prosecution—was apparently driven by his evident frustration with counsels' unwillingness to abide by the pretrial Order and their repeated disregard of his rulings. (*E.g.*, the judge's comments that "I appreciate good objections but I do not appreciate nor do I tolerate violations of this pretrial order about objections ... it borders on contempt of court"; or that counsel had "just crossed the line" by repeatedly asking the same question.)

While it appears that the judge was strict with both sides, all of these instances, including the judge's statement on three occasions that counsel was "in contempt of court," fall within the judge's discretion to prevent improprieties during the trial and to "rebuke counsel for improper behavior." *Logan*, 998 F.2d at 1029 (citation omitted); *see also In re Holloway*, 995 F.2d 1080, 1085–87 (D.C.Cir. 1993) (contempt citation upheld where counsel repeatedly asked same question after court sustained objection), *cert. denied*, —— U.S. ——, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994); *Williams*, 809 F.2d at 1089–90 (no prejudice where judge fined lawyer for contempt in presence of jury); *United States v. Jackson*, 627 F.2d 1198, 1206 n. 18 (D.C.Cir. 1980) (jury not likely to be swayed simply by judge's remark that defense counsel was courting contempt citation).

■ Finally, we reject appellants' claim that the judge showed bias against the defense through "more subtle, nonverbal messages, such as facial expressions, gestures, and tone of voice." While, as the Government concedes, it was proper for appellants to note their view of the judge's demeanor for the record, *see United States v. McCord,* 509 F.2d 334, 346 n. 34 (D.C.Cir.1974) (*en banc* ), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), the Government is also correct in asserting that demeanor is subjective. In many of the instances cited by appellants to show the judge's "gruff and angry manner" in responding to defense objections, the judge or the prosecutors specifically disagreed with defense counsels' characterizations of the judge's demeanor. Because we are reviewing a paper record, we cannot state with certainty that the judge never improperly glowered when responding to defense counsel. But even if we assume that the judge did display nonverbal hostility to defense counsel at isolated moments in the trial, these instances must be deemed to reflect only the "modicum of quick temper that must be allowed even judges." *Offutt,* 348 U.S. at 17, 75 S.Ct. at 15. More important, as our analysis above demonstrates, the record shows that defense counsel often gave the court reason to be angry. *See United States v. Weiss,* 491 F.2d 460, 468 (2d Cir.) ("[W]asteful tactics will lead a trial judge, during the heat of a nine-day trial, sometimes to become impatient."), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974).

#### c. Conclusion

Our thorough review of the record provides no support whatsoever for appellants' judicial bias claim. The judge's enforcement of procedural restrictions was necessary to maintain order in a complex and difficult trial, and his occasional expressions of irritation or impatience were most often provoked by counsels' aggressive behavior. No single remark cited by appellants may be plausibly interpreted to show bias, and the cumulative weight of all the cited instances demonstrates that the trial judge exercised admirable restraint in attempting to maintain order, often in the face of repeated provocation.

#### 3. Sentencing

Appellants Keith Cooper, Emanuel Sutton, and Armaretta Perry argue that the District Court, in calculating their sentences, erred by allocating to each of them responsibility for the total 50 kilograms of cocaine attributed to the conspiracy as a whole, without making particularized findings as required by our recent decision in *United States v. Anderson,* 39 F.3d 331 (D.C.Cir.1994). Three other appellants—Melvin Butler, John Monford, and David McCraw—were granted leave by this court to adopt the claims of the other individual appellants after the time for briefing had expired, and we consider the sentencing question as applied to them also.

We conclude that the District Court's failure to make particularized findings as to the amount of drugs attributable to Perry, Sutton, Cooper, and Monford was error requiring us to vacate and remand for resentencing. We reject Butler's and McCraw's claims, however, because we conclude that error in the lack of particularized factfinding as to these appellants was clearly harmless.

■ First, we address the Government's contention that by not specifically requesting individual factual findings below, appellants Cooper, Sutton, and Perry waived their right to appeal the attribution of the entire drug quantity to them. We think that Cooper's and Sutton's objections to their presentence reports were more than sufficient to preserve the issue. Cooper asserted that he should not be held accountable for the total amount of the drugs given his participation in the conspiracy was for "a limited period of time," while Sutton contended that "there was no testimony tying [him] to any drugs other than those with which he was allegedly involved" in specific instances and alleged that his correct base offense level calculation should be 32, not 36. J.A. XVIII 26, 117. Although Perry's is a closer case, we conclude that even her more general objection to the calculation of the total 50 kilogram amount was sufficient to preserve her claim. By challenging the factual basis for the calculation of the amount of drugs attributed to them in the presentence reports, appellants

placed the issue squarely before the District Court. In light of this, we cannot agree with the Government that appellants' failure specifically to request particularized factual findings amounted to waiver.

■ Having concluded that these three appellants did not waive their objection, we review the District Court's sentencing determinations as to them under a "harmless error" standard, rather than under the "plain error" standard applied in *Anderson* and in *United States v. Saro*, 24 F.3d 283 (D.C.Cir. 1994). We must determine whether, "on the record as a whole, ... the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *United States v. Root*, 12 F.3d 1116, 1121–22 (D.C.Cir.1994) (quoting *Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992)); *see also United States v. Molina*, 952 F.2d 514, 520 (D.C.Cir.1992); *cf. Saro*, 24 F.3d at 287.

The District Court assigned each appellant a base offense level of 36, attributing to each responsibility for the full 50 kilograms of cocaine involved in the conspiracy. As in *Anderson* and *Saro*, the version of the Sentencing Guidelines in effect at the time required calculation of the base offense level from a defendant's "relevant conduct," defined to include "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3(a)(1). Application Note 1B1.3 n. 1 explained that as applied to conspiracies, relevant conduct includes "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." *See Anderson*, 39 F.3d at 351–52 (citing U.S.S.G. § 1B1.3 n. 1).

In *Anderson*, we reaffirmed the standard articulated in *Saro* for applying these provisions to a "large but loose-knit drug distribution conspiracy." 39 F.3d at 352. In the earlier decision, we stated,

The extent of a defendant's vicarious liability under conspiracy law is always determined by the scope of his agreement with his co-conspirators. Mere foreseeability is not enough: someone who belongs to a drug conspiracy may well be able to foresee that his co-venturers, in addition to acting in furtherance of his agreement with them, will be conducting drug transactions of their own on the side, but he is not automatically accountable for all of those side deals.... To calculate the amount of drugs attributable to defendants under the third category of "relevant conduct," the sentencing court must "determine the scope of the conspiratorial agreement each joined." *United States v. Thompson*, 944 F.2d 1331, 1344 (7th Cir. 1991).

*Saro*, 24 F.3d at 288 (citations omitted). Applying these principles, in both *Anderson* and *Saro* we remanded for redetermination of some conspirators' sentences because the trial court "simply adopted the presentence reports' apparent conclusions that each defendant should automatically be responsible for the amount of cocaine involved in all the charged transactions." *Anderson*, 39 F.3d at 352; *see also Saro*, 24 F.3d at 288–89. The trial court's procedure amounted to plain error in *Anderson*, we held, because a "fair view of the evidence" indicated that it was "reasonably likely" that some appellants may have had only limited "agreements" to purchase or distribute less than the full 15 kilograms of drugs attributed to the conspiracy as a whole. 39 F.3d at 352–53. Similarly, in *Saro*, we concluded that the district court failed adequately to determine the scope of one appellant's agreement with the conspiracy, which may or may not have altered the amount of drugs properly attributable to him, but which in any event required remand. 24 F.3d at 288–92.

The sentencing transcripts in this case reveal that in sentencing Perry, Cooper, and Sutton, the District Court erred, as did the court in *Anderson* and *Saro*, by not making specific findings "regarding the quantity of drugs each appellant might have reasonably foreseen his or her agreed-upon participation [in the conspiracy] would involve." *Anderson*, 39 F.3d at 353 (citing cases). In sentencing these three appellants, the District Court adopted the findings in the Presentence Reports, and stated (with minor variations as to each) that "the conspiracy of which this defendant stands convicted involved 50 or more kilograms of cocaine which results in a corresponding base offense level

of 36." The court also noted without elaboration that "the quantity of drugs involved in this conspiracy was reasonably foreseeable to this particular defendant."

While the District Court thus acknowledged the need for particularity in attribution of drugs to each defendant, neither the transcript nor the presentence reports indicate that the necessary individualized findings had been made linking each appellant's scope of participation in the conspiracy with the quantum of drugs attributed to them. Of the three, only Cooper's presentence report made even a minimal effort to address this issue. But, after stating Cooper's involvement in the conspiracy and noting his conviction for possession of 73 grams of cocaine base, the report concludes only that "it was reasonably foreseeable by the defendant that the drug distribution conspiracy involved these large amounts of drugs." J.A. XVIII 27. These statements alone cannot satisfy the requirement of explicit analysis of the scope of Cooper's conspiratorial agreement.

We are unable to conclude from the record before us that the District Court's error in failing to make particularized findings was harmless—in other words, that it had "no effect" on the sentence imposed. Although the court assigned Cooper, Perry, and Sutton each an increase at sentencing for their managerial role in the conspiracy, it did not specify how in fulfilling this role each could properly be held accountable for the full amount of drugs involved. In *Anderson*, we noted that even "distribution center workers"—who presumably handled the flow of a large quantity of drugs over the duration of the conspiracy—might have been "responsible for distributing fewer" than the total kilogram amount attributed to the entire enterprise. 39 F.3d at 353. Similarly, it is possible (even if unlikely) that Cooper, who delivered drugs to the street, Sutton, who monitored street dealers, and Perry, who resided at a "stash house" where drugs were stored, might be deemed responsible for less than the full 50 kilograms here.

We recognize that the structure of the conspiracy proved in this case differs in some respects from those in *Saro* and *Anderson*, and that those differences may influence the District Court's sentencing determinations on remand. We noted in *Anderson* that it was

"likely" that the evidence indicated "multiple conspiracies rather than a single overarching one," 39 F.3d at 347, and that some appellants "*appear* to have been operating in isolation and to have 'agreed' only to participate in the small amounts they supplied." *Id.* at 352–53 (footnote omitted). Here, by contrast, the presentence report's factual findings actually suggest a single overarching conspiracy—but neither the report nor the sentencing judge undertook the critical next step of determining that each individual appellant's participation in the conspiracy made the entire drug amount reasonably foreseeable to him or her.

In *Saro*, we stated that

[s]ome phrases of the [presentence report] ... do suggest a finding that each transaction was indeed part of a single conspiracy. Even then, however, the PSR appears to treat the scope of the conspiracy as the same for each participant, without making any effort to define [appellant's] own agreement. In some conspiracies, of course, each participant has joined (implicitly or explicitly) in the overall scheme, so that the scope of the conspiracy is identical for each.... But the PSR here did not engage in this analysis.

24 F.3d at 289 (citations omitted). In this case, the evidence seems to point more strongly than in *Saro* to the conclusion that each of these appellants agreed to join the overall scheme, and "it may well be proper for the sentencing court [on remand] to hold [appellants] responsible for much the same quantity of drugs that the PSR attributed to [them]." *Id.* But we think the logic of *Saro* and *Anderson* requires the District Court, not us, to determine the proper scope of agreement for Cooper, Sutton, and Perry, and the extent to which they may properly be held accountable for the reasonably foreseeable conduct of their co-conspirators in furtherance of the joint undertaking.

As for appellants Monford, Butler, and McCraw, because they did not raise their improper attribution claims until after final briefing by both sides, we cannot determine from the record before us whether they preserved their sentencing challenges in the District Court. But as the Government has not argued in its supplemental brief that they waived their objections, we will not assume the contrary. Applying the same "harmless

**1106**

error" principles outlined above, we conclude that Monford's sentence must also be remanded. The presentence report indicates that Monford's role in the conspiracy was roughly equivalent to Sutton's—he "monitored street operations"—and also notes that he resided at a "stash house" with his mother, appellant Perry. As we have stated with regard to Sutton, Cooper, and Perry, we are unable to conclude whether a factfinder applying the correct legal standard would conclude that Monford could reasonably have foreseen the full 50 kilograms, and accordingly we must remand.

■ As for Butler and McCraw, however, any error in the failure to make specific factual findings in their sentencing was harmless. The presentence report, which was adopted by the District Court, specifically noted that Butler was one of several co-conspirators arrested after purchasing 200 kilograms of cocaine from undercover police officers. The District Court also accepted James Minor's testimony that "he and David McCraw picked up fifty kilograms of cocaine from a gentleman from California at the Day's Inn Hotel in Crystal City, Virginia in August, 1988." *United States v. Edmond,* 746 F.Supp. 200, 203 (D.D.C.1990). Because the evidence relied on by the District Court demonstrates that both Butler and David McCraw were personally involved in transactions that in themselves involved at least 50 kilograms of cocaine, we think it clear that the District Court's error in not making particularized findings in assigning these appellants responsibility for 50 kilograms of cocaine was harmless.

We conclude, therefore, that the District Court's error in not making "particularized factual findings regarding the amount of cocaine attributable to each appellant's participation in the [Edmond] organization," *Anderson,* 39 F.3d at 351, requires us to vacate and remand the sentences of appellants Cooper, Sutton, Perry, and Monford. Regarding Butler and David McCraw, however, we determine that the District Court's error was harmless and that remand is therefore not required.

### B. Individual Issues

#### 1. Rayful Edmond

Although appellant Rayful Edmond raises several individual challenges to his convictions and sentences, we need address only two: a challenge to his conviction for engaging in a continuing criminal enterprise and a challenge to his sentence for conspiracy.

##### a. The CCE Conviction

■ Edmond challenges his conviction for engaging in a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(b), which prescribes a mandatory life sentence for acting as a "principal administrator, organizer or leader" of a large continuing drug enterprise meeting certain statutory guidelines. Edmond argues that the District Court's jury instruction on the CCE charge permitted the jury to convict without finding all elements of the offense beyond a reasonable doubt.

The District Court instructed the jury that the essential elements of the CCE offense, "each of which the government must prove beyond a reasonable doubt," are:

First, that the defendant Rayful Edmond, III committed the offense charged in Count 2 of the indictment, that is, he conspired with others to commit narcotics offenses; and second, that the offense charged in Count 2 was a part of a continuing series of violations of the federal drug laws by the defendant ... which occurred after October 27, 1986; and third, that the defendant ... undertook to commit these offenses in concert with five or more persons, either named or unnamed in the indictment; and fourth, that the defendant ... occupied a position of organizer, supervisor or some other position of management with respect to these five or more persons in said undertaking; and fifth, that the defendant ... obtained substantial income or resources from his activities in the continuing series of violations; and sixth, that the defendant ... was the principal administrator, organizer or leader of the enterprise or was one of several principal administrators, organizers or leaders; and seventh, that the enterprise involved at least 1,500 grams ... of cocaine base or crack or, in the alternative, at least ... 150 kilograms of cocaine.

Trial Tr. (Dec. 1, 1989) at 117–18, *reprinted in* J.A. XVII.

With respect to the second element of the offense, the "continuing series" element, the district judge instructed that the Government must prove "beyond a reasonable doubt that Edmond committed the offense charged in Count 2 (conspiracy), plus two or more additional violations of the federal drug laws." The court then noted that those two or more violations should be drawn from any of the substantive offenses alleged in Counts 5, 14, 15, 16 or 18 of the indictment, or from any of the overt acts relating to the conspiracy detailed in paragraphs 4, 11, 12, 41 and 44 of Count 2 of the indictment. In its previous instructions relating to the conspiracy charge, the court had instructed the jury that reference to overt acts was not necessary to find a conspiracy because the Government was not required to prove an overt act as an element of the offense of conspiracy.

In its special verdict form, the jury relied upon the substantive offenses charged in Counts 5 (unlawful employment of a person under 18 in violation of 21 U.S.C. § 845b), 14 (unlawful use of a communications facility in violation of 21 U.S.C. § 843(b)), 15 (same) and 18 (same) of the indictment, and the conspiracy charge in Count 2 to find that Edmond had engaged in a CCE. The jury's verdict form indicated that the jury had not relied upon any overt act in finding that Edmond committed a CCE offense.

Edmond contends that the District Court's jury instructions relieved the Government of its burden of proof on an element of the CCE offense, and thus contravene *United States v. Jones,* 909 F.2d 533, 538 (D.C.Cir.1990) (jury instruction which relieves the Government of burden of proof on an element of the offense is constitutionally deficient). Appellant argues that the CCE instruction, following as it did a conspiracy instruction which permitted a conviction on Count 2 without proof of the alleged overt acts beyond a reasonable doubt, allowed the jury to convict on the CCE charge on less than proof beyond a reasonable doubt. Edmond argues that the District Court should have separately instructed the jury that all of the elements of an overt act must be proved beyond a reasonable doubt in order to be used in convicting on the CCE offense. Because the jury was permitted to convict Edmond on a CCE charge without finding the requisite series of violations of

federal drug laws beyond a reasonable doubt, appellant contends that this court should overturn his conviction on that count.

Although we note that the District Court's instructions on the elements of the CCE offense mirror those previously embraced by this court, *see United States v. Harris,* 959 F.2d 246, 252–54 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992), we need not decide whether the District Court erred in instructing the jury. Any such error would be harmless. The jury did not rely upon any overt acts in finding that Edmond committed the CCE offense. The jury's response to the special issue submitted by the District Court made this plain. The jury relied only upon substantive offenses separately charged in the indictment to convict on the CCE charge. With respect to the burden of proof for those substantive offenses, appellant does not allege that the jury instructions were deficient. Even if the instructions did allow the jury to convict under 21 U.S.C. § 848(b) based on a finding of overt acts without proof beyond a reasonable doubt—a question we do not decide here—it is apparent that the jury did not do so in finding Edmond guilty of the CCE offense. The alleged error could not have affected the verdict and would be harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "Harmless-error review looks ... to the basis on which the jury *actually rested* its verdict." *Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in original).

#### b. The Conspiracy Conviction

In addition to his conviction for engaging in a CCE under 21 U.S.C. § 848(b), Edmond was also convicted on the Count 2 conspiracy under 21 U.S.C. § 846. Edmond was sentenced separately for each offense, receiving concurrent sentences for each crime. Edmond contends that because the CCE conviction was based, in part, upon a finding that he engaged in the Count 2 conspiracy, his conspiracy conviction must be set aside. The Government agrees, based upon its reading of *Jeffers v. United States,* 432 U.S. 137, 155–57, 97 S.Ct. 2207, 2218–20, 53 L.Ed.2d 168

(1977), which holds that Congress did not intend cumulative penalties for violations of section 846 and section 848. Although the sentences imposed here were to run concurrently, when considered in light of *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), which holds that concurrent sentences are impermissible where Congress intended to prohibit cumulative punishment, *id.* at 864–65, 105 S.Ct. at 1673–74, the Government concludes that the District Court's concurrent sentences here cannot be tolerated. In accordance with the agreement of the parties, Edmond's conspiracy conviction and sentence shall be vacated.

### 2. *Keith Cooper*

Appellant Keith Cooper claims the District Court's recognition of a defense witness's assertion of a Fifth Amendment privilege not to testify during Government cross-examination violated Cooper's Sixth Amendment right to compulsory process under *United States v. Pardo,* 636 F.2d 535 (D.C.Cir.1980), requiring reversal of his convictions.

#### a. *Background*

Keith Cooper was charged in six of the twenty-three counts of the indictment: drug conspiracy in violation of 21 U.S.C. § 846 (Count 2); distributing cocaine base on February 17 (Count 6) and February 18, 1988 (Count 8) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; using minors to possess with intent to distribute cocaine and cocaine base on February 17 (Count 7) and February 18, 1988 (Count 10) in violation of 21 U.S.C. § 845b; and possession of with intent to distribute 50 grams or more of cocaine base on February 18 in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii) (Count 9).

At trial, the Government presented evidence that Cooper participated in the drug conspiracy by receiving at stash houses deliveries of cocaine and crack which he would then distribute through street dealers. Cooper was arrested on February 18, 1988, in the basement of 656 Orleans Place, from which police seized 73 grams of cocaine.

Several witnesses testified to Cooper's involvement in cocaine distribution on February 17 and 18. Cornelius McDonald, a juvenile, testified that, on February 18, he distributed cocaine for Cooper, who was working out of the basement of 656 Orleans Place, that Cooper had been in the basement when he was arrested, and that police discovered 100 $25 bags of cocaine base in a drain pipe in the basement. Testimony by several police officers corroborated McDonald's testimony. One officer testified that, from an observation post at the scene, he observed Cooper working out of 656 Orleans Place to replenish sellers. Three testifying officers specifically placed Cooper in the rear basement area when the search warrant was executed. One testified that, upon entering 656 Orleans Place, he observed Cooper throw down a sum of money, later discovered to be $1400. Three officers also testified that the drugs were discovered in a plumbing pipe.

In his defense, Cooper attempted to call Patrick Pinkney, another juvenile who had been involved in the drug distribution on February 18. Pinkney had previously been acquitted of unspecified charges arising out of his involvement in the February 18 activities. Cooper proffered that the scope of his direct examination of Pinkney would be limited to the incidents of February 18 and that Pinkney's testimony would "contradict Cornelius MacDonald." The Government insisted that if Pinkney took the stand, it would probe his involvement in the conspiracy on dates other than February 18, in order to test his credibility.

After some initial confusion regarding Pinkney's intention to invoke or waive his Fifth Amendment privilege, counsel for Pinkney stated that he would not be willing to waive that privilege and testify. The District Court allowed the prosecution to "put to this witness the two questions or three questions that you propose to put to him." The Government asked three general questions that would lead to testimony regarding Pinkney's involvement in the conspiracy, such as "Have you been to 656 [Orleans Place] prior to February 18th?" Pinkney refused to answer the questions, asserting his Fifth Amendment privilege as to each. Relying upon *United States v. Thornton,* 733 F.2d 121 (D.C.Cir.1984), the Court excused Pinkney from testifying because his testimony would lead to compelled self-incrimination in contravention of the Fifth Amendment.

Cooper contends that the District Court erred in relying upon *Thornton* for the proposition that "the accused's [Sixth Amendment] right to compulsory process ... does not include the right to compel a witness to waive his fifth amendment privilege." *United States v. Thornton*, 733 F.2d at 125. Cooper argues that *Thornton* presented a clear conflict between the defendant's Sixth Amendment right to procure testimony in his favor and the witness's Fifth Amendment privilege on direct examination. This case, Cooper asserts, instead presents a conflict between the defendant's Sixth Amendment right to procure testimony in his favor and the *Government's* non-constitutional right to cross-examine the witness offering that testimony, and is governed by *United States v. Pardo*, 636 F.2d 535, 544 (D.C.Cir.1980). Cooper contends that *Pardo* requires reversal. While we agree that *Pardo* frames the analysis for the issue, we conclude that *Pardo* does not dictate the result which Cooper advances.

#### b. Discussion

The Sixth Amendment to the Constitution provides that a criminal defendant "shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. The Supreme Court has elaborated upon this right, explaining that "the right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). However, as we noted above, the accused's right to compulsory process "does not include the right to compel a witness to waive his fifth amendment privilege." *Thornton*, 733 F.2d at 125. Thus, where a defendant seeks on direct examination to compel testimony from a witness which would lead to self-incrimination by the witness, we have recognized that the defendant's Sixth Amendment right may yield to the witness's Fifth Amendment privilege. *See Thornton*, 733 F.2d at 126–27.

This case does not present precisely the same conflict between the defendant's Sixth Amendment right and the witness's Fifth Amendment privilege as *Thornton.* Instead,

it was the Government's cross-examination of Pinkney with respect to his involvement in other aspects of the conspiracy that led Pinkney to invoke his Fifth Amendment privilege, a situation we considered in *Pardo.* In that case, six defendants were charged with possession with intent to distribute cocaine. *Pardo*, 636 F.2d at 537. Corbett, one of the defendants, pled guilty to separate charges in exchange for the Government dropping the charges in the indictment. The evidence against two remaining defendants consisted solely of the testimony of an undercover narcotics agent regarding their involvement in the drug conspiracy. *Id.* at 545. Before trial, the two defendants filed motions to secure Corbett's testimony purportedly to contradict the agent's testimony, arguing that Corbett's plea arrangement immunized him from further prosecution regarding the transactions. One defendant submitted an affidavit which declared that Corbett had told him, in the presence of counsel, that the agent was lying in stating that the defendant had made certain incriminating statements. *Id.* at 540. Although the defendants promised that their direct examination would not venture beyond the immunized transactions, counsel for Corbett responded that Corbett would invoke the Fifth Amendment if called to the stand. *Id.* at 540–41. Counsel expressed a fear that cross-examination of Corbett might touch upon matters which would expose him to possible prosecution. The Government fully supported his position. *Id.* at 541. The district court upheld Corbett's invocation of the Fifth Amendment.

On appeal of the issue, the *Pardo* court concluded that the case did not present a direct conflict between a defendant's Sixth Amendment right and a witness's Fifth Amendment privilege; but rather, "the less painful conflict between the defendant's Sixth Amendment right to procure testimony and the Government's right to cross-examine the witness offering that testimony." *Id.* at 542. *Pardo* mandates that when that conflict arises, "it is necessary to balance the defendant's need to present the evidence against the Government's ability to cross-examine the witness effectively to guarantee truthfulness and accuracy.... [W]here the rights of the defendant and the Government can be

reconciled, the defendant's constitutional right to procure testimony in his favor must prevail." *Id.* at 544–45. Because the defendants had a material need to obtain Corbett's testimony and because the court concluded that the Government's interest in cross-examination was fully satisfied, the court held that the district court had erred in excusing Corbett from testifying. *Id.* at 545.

█ However, that we must apply the same analysis as in *Pardo* does not require that we must reach the same result. Cooper's case presents starkly distinct facts from *Pardo.* Although the massive amount of evidence introduced against him clearly raises a material need for exonerating evidence—the greater the amount of incriminating evidence introduced against a defendant, the more material the need for exculpatory evidence— Cooper failed to proffer evidence which might meet that need. That is, he failed to demonstrate that Pinkney might, in fact, exonerate him. In *Pardo,* the two defendants proffered that Corbett's testimony would indicate that participation in the transaction by each of them was either "purely accidental" or non-existent, 636 F.2d at 540. Consequently, the court noted that "it is possible that Corbett would supply *exculpatory* testimony *exonerating* some of the alleged participants." *Id.* at 545 (emphasis added). Here, by contrast, Cooper merely proffered that Pinkney's testimony "would contradict Cornelius MacDonald," regarding certain immaterial facts, such as Cooper's location in the house at 656 Orleans Place and the location of the drugs when found by the police. At most, this evidence provided limited contradiction of testimony by MacDonald and arresting officers; it does not provide the potential exoneration necessary to demonstrate a "material need" under *Pardo. See Pardo,* 636 F.2d at 545. Without a proffer by Cooper that Pinkney would provide exculpatory testimony which might exonerate Cooper, we cannot conclude that the District Court erred in excusing Pinkney from testifying. Such a minimal showing of need by the defendant does not outweigh the Government's legitimate interest in cross-examining Pinkney concerning his involvement in the conspiracy.

Accordingly, we conclude that the trial court did not err in refusing to force Pink-

ney's testimony over his assertion of his Fifth Amendment rights, or in refusing to limit the Government's cross-examination.

### 3. Emanuel W. Sutton

█ We need consider only appellant Sutton's argument that the trial court committed clear error in admitting portions of a recorded conversation of a coconspirator under Federal Rule of Evidence 801(d)(2)(E). We reject this claim.

Appellant challenged the admission of a tape containing roughly half of a consensually recorded conversation between Alta Rae Zanville and Constance Perry at the Pier 7 Restaurant on March 23, 1989. The transcript of the redacted portion of the conversation played for the jury runs some 44 pages, and includes several references by appellant's mother, Perry, to his participation in the conspiracy, including his profitable relationship with Edmond.

█ Federal Rule of Evidence 801(d)(2)(E) provides that a statement by a coconspirator "during the course and in furtherance of the conspiracy" is not hearsay. Appellant concedes that Constance Perry was a conspirator and that the conversation occurred during the course of the conspiracy: he argues only that the second requirement for admission under 801(d)(2)(E) was not satisfied because Perry's statements were not made "in furtherance of the conspiracy." We review the trial court's ruling that a coconspirator's statement is in furtherance of the conspiracy for clear error. *United States v. Maldonado–Rivera,* 922 F.2d 934, 959 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Harris,* 908 F.2d 728, 737 (11th Cir.1990), *cert. denied,* 498 U.S. 1093, 111 S.Ct. 979, 112 L.Ed.2d 1063 (1991); *see Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987) (applying clearly erroneous standard to the question whether declarant was a coconspirator).

We have previously held that a statement is admissible under Rule 801(d)(2)(E) if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a coconspirator or other person's usefulness to

the conspiracy." *United States v. Tarantino,* 846 F.2d 1384, 1412 (D.C.Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988). While it is a close question, we think the District Court's determination to admit the taped conversation under Rule 801(d)(2)(E) was not clearly erroneous. Several excerpts may plausibly be interpreted as intended to keep Zanville "current on the status of the business," which was a determining factor in finding statements "in furtherance of the conspiracy" in *Tarantino,* 846 F.2d at 1412 ("[W]here the recounting took place soon after the events at issue, and where [the listener] was a participant in the overall conspiracy ... [the] reports helped keep [the listener] current on the status of the business."). The admitted excerpts include Perry's descriptions of efforts to avoid detection and statements which suggest that she was warning Zanville of danger and the need for caution. *See* J.A. VI 18, 27, 35. ("I think Rayful just gonna wait until this stuff cools off"; "Minor is the police ... he set her up"; referring to Edmond, "anything that he tell you to do, and if you do the opposite, something always happen") (sic).

The Government's claim that these and a few other comments created an "overall effect" of keeping Zanville current on the status of the business is somewhat overstated, as the ostensibly conspiratorial statements make up a relatively small part of a long conversation which touched on many other matters. We are more persuaded by the assertion that Perry's comments specifically relating to appellant Sutton were in furtherance of the conspiracy; we note in particular her references to Sutton as the "big person on the street," to his wife's role in triggering the police investigation into Sutton's activities, to Sutton's stealing from Edmond, and to Sutton's generous salary. *See* J.A. VI 42–43. These comments plausibly may be interpreted as providing "important background information to a key player, thereby helping [her] to carry out [her] duties," *Tarantino,* 846 F.2d at 1413. Perry warned Zanville to stay away from Sutton's wife and "identified a conspirator who was hurting the joint effort." Final Brief for Appellee United States at 196. *Cf. United States v. Hitow,* 889 F.2d 1573, 1581–82 (6th Cir.1989) (statements

identifying other conspirators and their roles are made in furtherance of conspiracy).

In cases cited by appellant in which the appeals court reversed a district court's admission of coconspirator's statements under Rule 801(d)(2)(E), the arguments that the conversations were "in furtherance of the conspiracy" were significantly weaker than in this case. *See United States v. Urbanik,* 801 F.2d 692, 698 (4th Cir.1986) (statement relied on by the Government was "merely a casual aside to the discussion"); *United States v. Bibbero,* 749 F.2d 581, 584 (9th Cir.1984) (hearer "virtually acknowledged" on cross examination that statement admitted was "idle conversation"), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985). We also reject appellant's claim that statements made to Zanville after her arrest terminated her participation in the conspiracy may not be deemed to be "in furtherance of the conspiracy." Rule 801(d)(2)(E) does not require that the statement be made to a co-conspirator. *See, e.g., United States v. Zavala–Serra,* 853 F.2d 1512, 1516 (9th Cir.1988) (statement to informant). The declarant's intent is the relevant inquiry. *United States v. James,* 510 F.2d 546, 549–50 (5th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975).

We also conclude, in response to a question raised at oral argument, that admission of a redacted version of the Perry–Zanville conversation did not violate the "rule of completeness" embodied in Federal Rule of Evidence 106. The rule provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." FED.R.EVID. 106. As we noted above, the redacted portion of the conversation which the jury heard constituted approximately half of the entire recording—44 transcript pages. Appellant has not argued that he sought admission of other parts of the transcript, and we are satisfied that the redacted portion included sufficient contextual matter in addition to the few statements relating to appellant so as not to mislead the jury. Indeed, in his brief appellant claimed that "by placing these [incriminating] excerpts *in the*

'*context*' *of the entire conversation,* the statements appeared to place Appellant Sutton squarely in the maelstrom of conspiratorial activity." Brief for Appellant Sutton at 13 (emphasis added). We have stated that "application of the rule of completeness is a matter for the trial judge's discretion," *United States v. Washington,* 12 F.3d 1128, 1137 (D.C.Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994), and we find no abuse of discretion here.

#### 4. James Antonio Jones

██  Appellant James Antonio Jones raises two individual claims on appeal. We need address only his argument that the District Court abused its discretion in failing to strike language referring to appellants' use of firearms and violent acts from the redacted indictment given to the jurors during their deliberations. While we agree that the failure to strike this language was error, we conclude that in light of the weight of the other evidence against appellant and the judge's instructions to the jury, the error was harmless and reversal is not warranted.

A redacted version of the indictment that was sent to the jury during their deliberations included the following language in an introductory section entitled "Roles of the Defendants in the Conspiracy":

> The defendants James Antonio Jones, also known as "Tonio," Jerry R. Millington, served as enforcers for the Edmond organization whose role was to protect those co-conspirators, both indicted and unindicted, involved in street level sales in the Orleans Place and Morton Place, N.E., vicinity. As such, these defendants carried firearms and engaged in acts of violence at the direction of Rayful Edmond III, to protect the territory, profits, and operations of the Edmond organization.

J.A. I 77.

Before the jury was instructed and retired for deliberations, appellant objected to the language relating to firearms and acts of violence. The judge stated that "It's not improper for this to go to the jury," and suggested that appellant work out the problem with the Government. Trial Tr. (Nov. 29, 1989) at 196, *reprinted in* J.A. XVII. No further action was taken before the redacted indictment was given to the jury.

██  We review the trial court's decision whether to strike surplus language from an indictment when an appellant claims prejudice under an "abuse of discretion" standard. *United States v. Jordan,* 626 F.2d 928, 930–32 & n. 1 (D.C.Cir.1980). Here, we think it clear (and the Government agrees) that the failure to strike the challenged language was error. Appellant was tried only on charges of conspiracy to possess and possession with intent to distribute cocaine; charges relating to possession and use of firearms and other acts of violence by appellant had been severed by the court on August 4, 1989. Any references to these counts in the redacted indictment were irrelevant to the charges being deliberated and were potentially prejudicial to appellant.

We are not persuaded, however, that appellant has demonstrated the "substantial prejudice" to his rights required for reversal. First, we note that the Government presented significant evidence of appellant's guilt, including his own statements indicating his involvement in the Edmond organization; testimony by police officers and coconspirators that appellant oversaw drug dealing operations on the Strip and both delivered drugs and received them from coconspirators on several occasions; and proof of his unexplained wealth and of relationships with coconspirators including appellants Edmond, Millington, Lewis, Monford, and Cooper. The weight of this evidence supports the conclusion that the surplus language did not substantially affect the jury. *Cf. United States v. Yum,* 776 F.2d 490, 493 (4th Cir. 1985) (failure to strike surplusage harmless where evidence of guilt overwhelming). Moreover, prejudice to appellant from the inclusion of the extraneous language in the indictment was also minimized by the court's limiting instruction:

> The indictment is not evidence. It is merely the manner by which a person accused of a crime is notified of the nature and extent of the crime charged and the manner by which he or she is brought to trial. The defendants are only on trial for the acts and conduct alleged in the indictment.

You must not consider the indictment as suggesting in any way that any defendant has committed any of the offenses with which he or she is charged in this case.

Trial Tr. (Dec. 1, 1989) at 73, *reprinted in* J.A. XVII.

In light of this admonition, and particularly because the Government made no attempt to exploit the references to firearms or violence in its arguments to the jury, we are persuaded that "the jury could understand the court's instructions and separate background information from the law and relevant facts." *United States v. Huppert,* 917 F.2d 507, 511 (11th Cir.1990) (no prejudice to defendant charged with obstruction of justice where surplusage indicated grand jury was inquiring into "drug trafficking and other related offenses").

Thus, while we agree with appellant that the failure to strike the surplus language was an abuse of discretion, reversal is not warranted because we cannot conclude that appellant was "substantially prejudiced" by the error.

## III. CONCLUSION

For the foregoing reasons, we affirm all of the appellants' convictions except Edmond's conviction for conspiracy, which we vacate pursuant to the agreement of the parties. We further remand the sentences of appellants Sutton, Cooper, Perry, and Monford for reconsideration of the scope of their participation in the Edmond drug distribution organization.

*So ordered.*

Before: EDWARDS, Chief Judge; WALD, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS and TATEL, Circuit Judges.

### ORDER

July 19, 1995

Per Curiam.

The Joint Suggestion For Rehearing In Banc and the individual suggestions of appellants Jones and Sutton have been circulated to the full Court. No member of the Court requested the taking of a vote thereon. Upon consideration of the foregoing, it is

ORDERED, by the Court *in banc,* that the suggestions are denied.

Before: EDWARDS, Chief Judge; SILBERMAN and SENTELLE, Circuit Judges.

### ORDER

July 19, 1995

Per Curiam.

Upon consideration of appellants' joint petition for rehearing and of the individual petitions for rehearing of appellants Jones, Sutton, Edmond and Lewis, it is

ORDERED, by the Court, that the joint petition and the individual petitions of Sutton, Edmond and Lewis are denied. It is

FURTHER ORDERED, by the Court, that the petition of Jones is granted only insofar as his sentence is remanded for reconsideration under the principles set forth in *United States v. Edmond,* slip op. at 41–47 [52 F.3d at 1103–06].